Case number 17-1232 and 17-1250 Erick Peeples v. City of Detroit Good morning, members of the panel. I'm Bruce Elfin. I represent Erick Peeples and 10 other for rebuttal and also the EEOC has been granted three minutes and I've agreed to that for them to argue as well. Okay, you may proceed. Thank you. Basically, I think there's two questions and then there's subparts. One question, is there a triable issue of fact with respect to whether race was a factor in the treatment of my clients in a layoff in 2012? And I believe the evidence shows that when you have 11 minority firefighters, 10 African-Americans, one Hispanic, who were not scheduled to be laid off at all, and then when their union acts to challenge the city's list that had been created by the HR people responsible, using the applicable rules, that they are then laid off immediately, they are given their notices immediately before the layoff becomes effective, and 11 white firefighters from an earlier cadet class have their layoffs canceled. When you have that difference in treatment, I think there's a triable issue of fact. It doesn't depend upon statements of animus or anything else. Whatever other proof you have. So I think there was a triable issue of fact that was just missed. Secondly... Now, do you state that as to both defendants equally? Well, Your Honor, the only party that could lay anybody off is Detroit. But in a section of the statute that this Court's never ruled on directly, Section 2000E-2C3, it says it's an unlawful employment practice for a labor organization to cause an employer to discriminate on the basis of race. And even if Detroit says, we didn't care what race anybody was. We knew there were going to be some layoffs. Once they were caused to shift that layoff to be racially discriminatory, the union, I believe, bears responsibility, and bears responsibility under Title VII. Not under the DFR standard, which is what the Court decided in the Court below. This Court in Wells v. Chrysler had adopted the DFR standard for claims against a union under Title VII. Well, Wells involved the DFR under Title VII claims, so I'm not quite certain really what it relied upon. It's an unpublished opinion. If you say that the union caused the discriminatory act, or caused the city, rather, to commit the discriminatory act, so are you saying that both the city and the union would be liable under Title VII, or how exactly do you parse that, if you do? Well, I believe that's really up to a jury to decide how to parse responsibility. I think the city cannot, if they knew that they were doing things to save white firefighters, and they acquiesced. They acquiesced at a time where nobody bothered to go back and say, well, you know, the rule's been here for 40 years. That rule is city seniority when it comes to layoff. So the city, though, at the outset proposed a list, and then altered or did a different list after the union became involved. So are you saying that the city had a duty to do something that it didn't do once the union suggested going by departmental seniority? Well, I think the city had an obligation to follow its rules. And if the city says, you proposed departmental seniority in 2009, it was rejected. We have, for layoff purposes, city seniority. Had the city said to the union, here's our list. It complies with the rules. You go ahead and do the simple thing. We'll implement it. You grieve. You grieve that we did it wrong. Instead, the union says, if you don't go our way, we're going to go into court and tie up a huge SAFER grant that's going to save hundreds of jobs. And if we tie up the timing of that grant, the city of Detroit may lose it entirely. So now the city of Detroit was willing to abandon the rules and acquiesce into what the union wanted. Sounds like racial motivation. That's the reason they did it. Sounds more like economic motivation. Well, your honor, it certainly was economically motivated for the people that got their jobs saved. For the people that were laid off, I would think that if the union president testified, I know who was white. I know who was black. I know who got laid off and who got saved. I mean, you don't have to have a motivation that I'm doing it because you're black. But if you're conscious of the race of the individuals you're acting on, I don't think you can ignore that. And the plain language of the statute isn't that they have to do it under a DFR. The judge below said it's a DFR. Even the Seventh Circuit case relied upon in Wells has been vacated by the Seventh Circuit. They said that language doesn't apply anymore. In the Green case, they vacated it. Ninth Circuit and Garrity came out and said same thing. You must have a Title VII matrix, the same proof matrix you would have under normal Title VII claims. You don't change it. I want to ask you about something else. Sure. I think at least the record suggests that Mr. Plaintiff Rivera exhausted his remedies with the EEOC and the other plaintiffs did not. And you've argued for a savings under the single file rule. Tell me how you justify that because Rivera was under a national origin discrimination complaint. The others, I believe, were race. Are you conflating or does the EEOC regs permit a conflation of those two to satisfy exhaustion as to all or am I misreading something? That's not the argument we've made. The argument we've made is that there were approximately 20-some charges filed against the union and the city. The city is the only one to raise the argument about whether or not you satisfied all the technicalities of Title VII. That's not a DFFA argument. It's not related to the union. We have an example. People started getting rights to sue. We had five people that filed charges that were timely. Poe, Peoples, Shack, Anderson, McLeod, and Rivera. The four African-Americans, three of them got these acknowledgment of settlements issued two months after they had already filed in court. Mr. Peoples got his right to sue against DFFA on the charge against the union. We believe that as a practical matter, the commission's processing of those charges, by sending the acknowledgments out after the case was filed, it's very clear to everybody, they weren't processing these charges anymore. They were done. These people were in court. We waited for the state to be lifted and then proceed. And so I do believe that there's valid race charges that were filed against the city that are available for single filer and that can be used. And I understand my time's up. Thank you. You'll have your rebuttal time. Okay. Thank you, Your Honor. Good morning, Your Honors. I'm Jim Tucker with the Equal Employment Opportunity Commission. I'm here principally to address the commission's position on whether or not the district court erred in applying the duty of fair representation standards to a Title VII claim. Before I get to the commission's position on that, if I could briefly speak, Judge Alder, to your question about how you reconcile or present a claim under C-3, Section 703 or 2000E-2 of Title VII, regarding getting a union or a union inspiring the employer to discriminate against. What you would have, I understand, would be simply two separate actions under Title VII. Title VII, Section 2000E-2A1 prevents employers from discriminating. So if the employer has taken a certain action, there would be an action under A-1 for the employer. Under C-3 provides an action against the union for its participation in that conduct. So it wouldn't be under the provisions regarding union discrimination. So there are two separate avenues for relief there. As far as the imposition of the duty of fair representation elements into this claim or into claims under Title VII generally, and that's our particular concern here, Mr. Elephant addressed fairly clearly the general issue and the problems, especially with the unpublished decision in Wells kind of adopting without analysis a standard that the Seventh Circuit has explicitly repudiated because there simply is no room under the statute or under controlling authority for an interpretation of Title VII as being subject to duty of fair representation claims. As early as 1974 in the Alexander v. Gardner-Dever Supreme Court decision, the court recognized that the duty of fair representation was an aspect of labor law that was in existence, maybe difficult to establish for a plaintiff. And in light of that, Congress enacted Title VII and its protections against union discrimination, which offer supplemental, often overlapping, but still distinct protections against discrimination. Looking at the case law as it's evolved over time, there aren't a large number of cases that address this issue, but those cases where the courts have actually delved into the question of whether or not Title VII standards are controlled by the duty of fair representation have rejected that approach. Again, the Seventh Circuit in its Green decision explicitly repudiated the language from its earlier decision in Bug. Bug is the touchstone decision that courts have routinely been applying mechanically without any analysis as to Title VII claims involving a union, where they simply announce that the requirements of a duty of fair representation claim, that is a violation of the collective bargaining agreement, essentially, and then an action by a bargaining member by the union, that those are the requirements that oppose Title VII as well. And again, for the reasons offered in the court decision in Green and adopted as well by the Ninth Circuit in Garrity, we think that's the wrong analysis. What about the other two circuits, the Third and the Tenth Circuits, and Young and York? That's right. We doubt a few cases. The Martinez case in the Third Circuit is in contrast with another unpublished decision. There are two cases in the Third Circuit that are unpublished that have gone either way. Neither has examined the issue in great depth, certainly not the adoption of the duty of fair representation. Elements in a Title VII claim, it's simply mechanically applied them just as the district court did here and as was done in the unpublished decision in Wells. Tenth Circuit, same thing. Simply noted that, as this court did here, saying a statement that courts have applied the bug factors, period, and citing bug. Now bug was, again, a Seventh Circuit decision which involved a claim involving Title VII, and in bug the court simply dropped a footnote and said to establish a Title VII claim against a union, you have to show, and it listed one, two, three, the elements of a duty of fair representation claim, period. No explanation, no analysis of the statute, no acknowledgment of the Supreme Court's prior already controlling decisions such as Alexander v. Gardner Denver or other cases or other authorities that simply, in our position, foreclose such an approach. And we've also pointed out the damages aspect of this in our brief. I'll leave it to that. Is there no further questions, Your Honors? Thank you. Thank you. Good morning, Your Honors. Christopher Legge here on behalf of the International Association of Firefighters, Local 344. During this argument, I'll refer to them as the DFFA, Detroit Firefighters Association. This is a race discrimination, desperate impact claim that is grounded in a collective bargaining matter. That is a dispute between the city and the union over how the city should lay off or riff. So that's important to begin the analysis. We believe that the court applied the right analysis, which is a summary judgment analysis as referenced in Wells. Let me say this. This court in Farmer in 1981, before the Seventh Circuit ever ruled on this, pointed out that there was this overlap between Title VII and a duty of fair rep, that it was axiomatic. You had to find a violation of the duty of fair representation to find a Title VII violation. So here you have the city taking one position on a contract, the union initially taking another position on a contract. The city has an undisputed fact, controlled the layoffs and the demotions and transfers, a point that the district court made in its decision. The union then changes its position after getting legal advice, and then pursues contractual claims on behalf of the plaintiffs in this case to the point where they receive full back pay. So there is no evidence in this case of a violation of the duty of fair representation. If anything, Your Honor, I would submit that the DFFA here behaved almost in a textbook union seminar practice of doing what's right. They declared they got it wrong. They went back to the city. They made full apologies. And even though they spoke to plaintiffs who were surreptitiously taping them, they made full declaration that they were confused and they did what needed to be done here. You reject entirely the concept that in this type of case the duty of fair representation just goes out the window, that it's not a requirement. What I reject is the notion that you don't use that analysis at all. You say that, you just don't agree with that. Well, the problem with the department's position there is duty of fair rep doesn't apply in Title VII cases against the union when it's not contractually driven. If the union is trying to exclude a person who wants to be a union member, not a contract dispute, Title VII applies in its full glory. But here, the pivot point here is the collective bargaining agreement. And you cannot find a Title VII violation unless you find that the union is doing something discriminatory with relationship to the contract dispute. And here, the union did not do that. Now, he started his argument by saying that the tribal issue of fact in this case was race of basis for this layoff. Well, as the court pointed out, they presented no direct evidence of race. They presented no circumstantial evidence of race. And they didn't present any statistical evidence of race. The court pointed out on at least 11 occasions there was gaps in this thing. And all the union did when it was presented with this issue was adopt a position, retreated from that position, and then pursued the claims on behalf of these plaintiffs. So, counsel, you say that there was no statistical evidence presented. But there was evidence of the numbers. There was a simple mathematical evidence about race, numbers, and their percentages calculated therefrom. So what isn't that sufficient statistical evidence when you're talking about a small universe and easy, calculable, I guess, mathematical calculations to be performed to get those percentages? Why is that kind of statistical evidence not significant enough? I have two responses, Your Honor. First of all, there was no evidence. That was the argument that was put in his brief. The court pointed out he presented no evidence. Secondly, the court said it can't consider the case on a desperate impact because he did not. And it's in a footnote in the trial court. There were 300 employment transactions here. 300 employees were either transferred or demoted or laid off. And the court said it could not make an assessment of a desperate impact claim unless it had the full evidence of what happened. So this argument that you should abandon Wells here, it doesn't make sense. Here, it's very simple. You can't find a Title VII violation unless you find a breach of the duty of fair representation. And conversely, if you find a breach of the duty of fair representation, if the union was discriminated on the basis of race or age or sex in the handling of a participant's grievance or a member's grievance, then you will find a violation of Title VII. And that's what Farmer says in 81. This predates the Seventh Circuit. But, Your Honor, I would submit to you that under any standard, under any standard in this case, even if you buy into the plaintiffs' and the EEOC's arguments, there is no evidence in this case that the union engaged in discrimination. There's no evidence whatsoever. The best they have is these random two statements, two or three statements, that were notably not captured by the surreptitious taping about references to saving the white boys. Other than that, and one is attributed to a city official who has no role in whatever the union did in this matter and no efforts by the plaintiffs to ever link that up, in which that was what drove the union's actions. Other than that, that's all they have. And those are not, those do not create material facts sufficient to defeat a Rule 56 motion. Now, Your Honor, I'd like to speak to on the damage sections. We would say both on the analysis under duty of fair rep, they're not entitled to these damages because they haven't demonstrated what the very high standard for compensatory damages or punitive damages under duty of fair rep. And we would submit, even if the analysis is done under Title VII, they have not demonstrated their entitlement to damages for compensatory damages or punitive damages. You don't have evidence of outrageous misconduct, real vile behavior. And I would parenthetically add, Your Honor, as to the element of compensatory damages, we played hell trying to get discovery of their compensatory damages. We couldn't get them to testify to it. We had to fight to get records. They just didn't offer those. So under either standard, we think that matter, it should have been dismissed. Part of those claims should be dismissed. The last part I want to speak to, Your Honor, is our cross-claim. And I do that with some trepidation. I'm a plaintiff's attorney and I'm a union attorney and we're a big believer in Title VII. But I think there are some cases which merit the court's attention. Now, the trial court analyzed this under Rule 11, found the technical flaw in our efforts to get the case dismissed, and then frankly, I think, offered a very soft argument to the plaintiffs in this case that they had at least a colorable claim that the duty of fair rep standard didn't apply. But it didn't consider the other two standards that we looked to, which was Title VII and Section 1927. And so let me contextualize this for a moment. This is a city. When all this happens, the city is on the cusp of going under. An emergency manager is appointed. Within a matter of months, the city is in bankruptcy. And this litigation is started. And they have presented utterly no evidence, utterly no evidence of discrimination. Not actual discrimination, not statistical discrimination, not circumstantial evidence of discrimination. They presented no evidence of their damages. They lose their damage claim as a matter of law and they lose their damage claim as a matter of fact. We begged them to get rid of those damage claims. And we tried to pursue it and we had a fight with them about it, but they kept them in the case. So we would say that a union that has to pay for litigation like this, with its members' money, at a time when they are under attack for both their health care and their wages, the emergency manager abrogated the collective bargaining agreement. Wages were reduced. Benefits were reduced. Pension and health and welfare. And they are confronted with a claim of race discrimination. When they committed union resources to arbitrating this matter, getting an arbitrator, getting a court record, inviting plaintiffs to attend the hearing, in which they did. In which they all received between $4,000 and $7,000. And then within a matter of weeks, then, to raise a race claim. And can't produce any evidence for it or support damages. Isn't this a problem that the union basically created? I mean, the city came out with a particular list. And it was the action of the union. I know you said they went back and they saw the error of their ways and they apologized and they changed. But now you talk about union resources, but this is an issue that the union created by their actions. Fair enough. They did. And they fixed it. And they not only fixed it, they threw a lot of money at it to get it fixed. In getting to arbitration and getting checks into the hands of their members. They did everything they did to correct it. I mean, we all know the standard is that the union doesn't have to be infallible on its reading of its contracts. What it did do is recognize that there was a split at the board. Called in legal advice. Got legal advice. Gave the legal advice to the plaintiffs in this case. Said we will do what we can to fix you. Had a grievance filed, a placeholder grievance filed, so they could correct it. What we're arguing is, Your Honor, I think the analysis has to begin. Once they had evidence of where this was, once they knew how little their case was, they didn't have the right to pursue this case and keep running up the bills in this case. This was litigation that was unnecessarily vexatious. We review your request for compensation under an abuse of discretion standard. I understand. Thank you, Your Honor. Thank you. Jason McFarland. Good morning, Your Honors. Jason McFarland on behalf of the city of Detroit. Plaintiff's theory in this case as to the city essentially is that the union either bullied, coerced, intimidated, threatened the city to change to the seniority that was going to be used in the reduction in force. There's no allegations that the city decided, there's no evidence showing that the city decided to change this seniority because of race. The city initially used city seniority, which was in the rules, but, however, the union's contract at the time referenced a rule from 1977, not the current HR rules that the initial list was done. There was a lot of dispute between the union and the city on which rule to apply. Ultimately, the city chose to go with the unions. Plaintiff argues that we should have just told the union, well, grieve it. Well, that doesn't always work. Grievance is not a simple matter either. It's not as big as litigation, but it sure is not simple and it is not cheap. The city felt that there was enough of a dispute between the parties to choose one seniority over the other. It's completely normal for the city and the union to change depending on interpretations of the contracts. That's what the grievance procedure is for. This, however, is not the grievance procedure. We do have this comment that was attributed to the union about trying to save the white boys. There is a comment attributed to Roger Williams. They were trying to save the white boys. Now, depending on which version of the comment we're looking at, the version that was presented to the district court was actually hearsay upon hearsay. The version that was submitted to this court is a direct from one of the plaintiffs, says he heard it from Roger Williams. With Roger Williams' involvement in this, he was not a decision maker in this case. Roger Williams was the HR individual assigned to say, he was told, use this type of seniority. So he did the first list. Then they were told, the department decided to use departmental seniority after discussions with the union. Then he was told, apply departmental seniority. That's what he did. There was two lists. The first list was a city seniority. The second list was a departmental seniority. Nowhere on either of those lists will you see the race of any of the plaintiffs or other employees of the city of Detroit. It was done solely based off of the seniority, which seniority was to be used. With respect to the exhaustion of remedies, plaintiff and the district court made no arguments against the city's motion for summary when it came to that argument. The court noted it specifically that the only thing plaintiff did was restate the issue and state that they disagreed. Now they want to argue against it and say there was an additional plaintiff or that the acknowledgment of settlements were, in fact, letters to sue, but they aren't. We briefed it pretty clearly, but the acknowledgment of settlements are not an admission from the EEOC that they're no longer going to proceed with the case. It's not a right to sue letter. What they state is that the parties have come to terms, they've received full back pay, and so it was an acknowledgment of the settlement that the grievance ended up leading to. With respect to the statistical evidence, I guess we can call it, we're in agreement with the DFFA. There's just not enough there to support the claim. They ignore the entire reduction in force, which affected approximately 300 people. Further, their statistics are so narrow that it actually removes one of the plaintiffs. One of the plaintiffs, Anthony McLeod, was not, in fact, laid off. He was demoted. Now, he ultimately was laid off for seasonal reasons, but he was not part of the initial reduction in force layoffs that the plaintiffs are relying on. So their statistics don't even cover all of the plaintiffs in this case. And so he was. So the way the layoffs work is there's a reduction based off of formerly held classes, and so he had a class to bounce back to because he was formerly a boat deckhand. So he bounced back to that. Now, for seasonal reasons, later in the year, he got laid off, but it was not as part of the RIF. Really, at this point, let's- I just have a curiosity question. Absolutely. In the issue of departmental seniority versus citywide seniority, I'm just a little surprised that there would be that many people that were in the fire department that had jobs somewhere else in the city. So this is actually a byproduct of the last two classes at that time that had come into the fire department. The last two classes that had come into the fire department were actually transfer classes, so they weren't open to everybody. They were open to current city employees. So the two last classes were open to current city employees, so that's where that disparity came in when it came to the type of seniority. Thank you. Thank you. Thank you. Your Honor, I guess I'll start with the fact that this is a disparate treatment case, not an impact case. I heard from the other side that this is somehow an impact case. It's never been pled that way. It's not proved that way. Number two, the evidence that the union in mid-September finally asked its attorneys to interpret the proper layoff rules, in our opinion, is evidence of pretext. It shows that they feigned that they didn't know.  They said, all right, we're going to bounce you from $20 million of safer grants unless you go with our rule. They didn't bother to ask their lawyers what the right rule was. They didn't bother to make an inquiry. They went full speed ahead. And the city, did the city merely say, oh, gee, yeah, we'll go with your rule. We think you're right. No. The city official, Zach, it's in the record we've cited to this court, said, we cannot afford to lose this grant. It's in one of the bulletins to the entire fire department. We've got to work on a deal with the union. Well, the union caused the deal. The city agreed to the deal. And I'm sorry, I think when you have a group of minority fighter fighters who are affected, who look at the list, I mean, everybody saw that matrix before the layoffs. When they looked at the list, they said, I'm not affected. I'm not impacted. And then two days before the layoff goes into effect, they start getting phone calls. They'll come to work for your next shift. You're going to be laid off. And they're in their firehouses. And the white firefighters who were in the 2004 class who have less city seniority are taking their notices and throwing them away and telling them, oh, I don't have to worry about it. I've been told it's going to be fixed. Okay. Yeah, we don't have every bit of proof. But I believe a jury, when they look at this, would have no problem finding that race was a factor and a factor in the treatment between these white firefighters and these minority firefighters. I think on the charges, I think there's sufficient information that even if, for example, Mr. Poe's right to sue wasn't in the file that I could observe, he filed a timely charge. Even if we go back and say, EEOC, give me a copy of his right to sue, they should be able to give it to us. And if we do, that cures any defects. So I don't think that that's jurisdictional. It's a procedural defect that can be taken care of. They cite to the Farmer case. Farmer versus ARA services back in the day was basically looked at as stating that, yeah, you could have a DFR claim and you could have a Title VII claim. And I don't think your Title VII claim is only dependent upon if you can get outside the contract. It doesn't work that way. The statute applies to all acts by the union. And they wouldn't have a clause in the statute that says, if the union causes an employer to discriminate, the union knew exactly who the people were that they were saving, they knew exactly who the people were they were putting in harm's way. And because they changed their mind after these people had been put back to work and pursued the grievance and got the city to back pay, we've never been able to figure out whether it's right. It doesn't negate the claim against the union. And I think there are sufficient facts to be tried, especially if you apply the right framework and theory under 2000A's 2C3. And on damages, I just think the judge below was wrong. Section 1981A allows for punitive and compensatory damages. You've addressed this, but I just want, for my own sake, clarification. Excuse me, Your Honor. Is it your possession that in a Title VII case of this nature, duty of fair representation just is out the window? I think it's out the window. Under any circumstances. Well, because here, the procurer of the duty of fair representation, by getting an opinion and then processing agreements. That's not the answer to my question. I'm sorry. You're just saying in a Title VII case, just forget about ever mentioning duty of fair representation because that's not a defense, doesn't enter a Title VII case of this nature. It should not limit the proof of the plaintiff in a Title VII case to a violation of Title VII, which is what the union argued here and what the court below found. So does it not matter? They can argue. We did everything we could to fix it. At least then we get to argue whether that's pretextual or not. We get to argue whether that's a false reason, whether that's to hide their true motivation. We at least get that argument. And I'm not stuck with must I prove direct evidence of racial bias and animus in order to get punitive damages. No. You go with the Kolstad standard, you go with the standard and the statute. We ask the court to reverse and remain in this manner. Thank you. Counsel, thank you for your arguments this morning. Very much appreciate them. The case will be submitted. You may call the next case.